**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**MICHAEL REICHERT**                                                          **PLAINTIFF**

**V.**                                        **4:08CV00158 JMM**

**UB MORTGAGE, LLC,
FINANCE AMERICA, LLC,
OCWEN LOAN SERVICING, LLC,
successor to OCWEN FEDERAL BANK, SFP
and KELLY GLEASON, individually**                                    **DEFENDANTS**

<u>**ORDER GRANTING MOTIONS TO DISMISS**</u>

Pending are the Motions to Dismiss filed by each of the Defendants and a Motion to

Strike filed by Defendant Finance America LLC.  The Plaintiff has responded to the motions.

The Court has considered all of the pleadings.  For the reasons set forth below, the Motion to

Dismiss of Defendant Ocwen Loan Servicing LLC is GRANTED, the Motion to Dismiss of

Defendants UB Mortgage LLC and Kelly Gleason is GRANTED, and the Motion to Dismiss of

Defendant Finance America LLC is GRANTED.   The Motion to Strike is MOOT.

According to Plaintiff's Amended Complaint, Plaintiff obtained a mortgage through

Defendant UB Mortgage LLC ("UB Mortgage") in 2005.  Plaintiff dealt with UB Mortgage

through its employee, Defendant Kelly Gleason.  Ms. Gleason supplied Plaintiff with a good

faith estimate of his mortgage terms on January 14, 2005.  The estimate stated that his interest

rate would be 6.6% for a 30-year fixed rate conventional loan.  However, at the closing Plaintiff

contends he was presented with a promissory note which stated that his interest rate would be

6.495% for a 3-year adjustable rate mortgage ("ARM").  (Pl.'s Ex. 2).  The promissory note also

included an addendum which stated that there was a 3% penalty for prepayment of the loan

within the first year, a 2% penalty for prepayment within the second year, and a 1% penalty for

prepayment within the third year.  (Pl.'s Ex. 3).  The promissory note stated that the lender was

Finance America, LLC in Irvine California.  (Pl.'s Ex. 2).

        After reviewing the promissory note, Plaintiff stopped the closing and called Ms. Gleason

to complain.  According to the Plaintiff, Ms. Gleason assured him that his rate would not rise.

Plaintiff then called his accountant to discuss the situation.  Plaintiff's accountant told him that

"if he had to have the house ... he could always immediately refinance it at the market rate."

(Amended Complaint, at p.3).  Plaintiff signed the promissory note and mortgage.  Plaintiff

claims that the increased interest rate in the promissory note resulted in $150,000 more in

interest than the original rate listed in the good faith estimate.

        Plaintiff also claims that the settlement charge disclosure sheet reveals a Yield Spread

Premium ("YSP") payment made by Defendant Ocwen to Defendant UB Mortgage of $2,100.

Plaintiff contends that the YSP constitutes commercial bribery under 18 U.S.C. § 1952.  The

settlement sheet was mailed or sent by computer which constitutes mail fraud in violation of 18

U.S.C. § 1341 or wire fraud in violation of 18 U.C. § 1343.  Plaintiff also claims that the faxing

of the good faith estimate and the telephone call by Ms. Gleason where she represented that his

interest rate would not increase constitutes wire fraud.  Plaintiff contends that the commercial

bribery, wire fraud, and mail fraud are predicate acts amounting to a violation of 18 U.S.C. §

1962(c) ("RICO").

        Plaintiff further contends that the practice of paying the YSP to the broker, or UB

Mortgage,  was a fraudulent scheme that induced UB Mortgage to breach its contract with

Plaintiff, to defraud Plaintiff, and to obtain a loan for Plaintiff in excess of market rates.  The

lender, Ocwen and/or Finance America, intentionally structured its broker premium fees to

encourage brokers to negotiate loans at above market rates.  The Plaintiff alleges that the "conspiracy between the lenders, Finance America and Ocwen, and the broker for the payment of yield spread premium for enticing the borrower into higher than market rate mortgages was the enterprise through which the pattern of racketeering was conducted by the Defendants and Kelly Gleason was the person who primarily conducted it."  (Amended Complaint, at p. 5).  The Complaint contains claims for violation of RICO, the Deceptive Trade Practices Act, and a claim under Arkansas law for intentional interference with contractual relations.

<u>Rule 12(b)(6) Standard</u>

The United States Supreme Court recently clarified the standard to be applied when deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *See Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  *Id.* at 1964-65 (citing *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508, n. 1, 122 S.Ct. 992 (2002); *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827 (1989)("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683 (1974)( A well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").  Although "[g]reat precision is not required of the pleadings," the complaint should state how, when, and where the cause of action occurred. *Gregory v. Dillard's Inc.,* 494 F.3d 694, 710 (8th Cir. 2007).  "So, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency

should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Bell Atlantic*, 127 S.Ct. at 1966 (internal citations omitted).

RICO Claim

Plaintiff alleges that the Defendants violated 18 U.S.C. § 1962(c) ("RICO") by committing commercial bribery, wire and mail fraud.  18 U.S.C. § 1962(c) provides, in relevant part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . .

Thus, a plaintiff who brings suit under 18 U.S.C. § 1962(c) must prove that the defendants engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Handeen v. Lemaire,* 112 F.3d 1339, 1347 (8th Cir. 1997).

The Defendants contend that the Plaintiff has failed to allege the elements necessary to prove a RICO claim, specifically the enterprise element.  The Supreme Court in *Turkette* stated that "[t]he 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages."  *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2529.  Pursuant to *Turkette*, the Eighth Circuit has identified three characteristics possessed by all RICO enterprises: (1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering.  *Handeen,* 112 F.3d at 1351 (citing *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 995 (8th Cir.1989)).  In addition to having a common or shared purpose which animates those associated with it, it is fundamental that the enterprise "function as a continuing unit."  An enterprise "is proved by evidence of an ongoing organization, formal or informal, and

4

by evidence that the various associates function as a continuing unit." *Turkette,* 101 S.Ct. at 2528.

As pointed out by UB Mortgage, the facts of this case are similar to *VanDenBroeck v. CommonPoint Mtg. Co.,* 22 F.Supp.2d 677 (W.D. Mich. 1999).  In *VanDenBroeck*, the plaintiff alleged that his mortgage company, CommonPoint, inflated the interest rates on Plaintiff's loans above interest rates at which the loans could have been made.  After closing of the loans, Commonpoint sold them to an end lender for a fee referred to as the "upsell" or "back end fee" which was based upon the difference between CommonPoint's loan rate and the end lender's rate. Further, Plaintiff alleged that the interest rates or monthly payments on the loans which Plaintiffs ultimately obtained from CommonPoint exceeded the rates or amounts which CommonPoint originally promised.  *Id.* at 680.

The district court dismissed the Complaint finding that the plaintiff's allegations were insufficient to establish a RICO enterprise because there was "no allegation, even in conclusory form, showing that 'an organizational pattern or system of authority . . . provide[d] a mechanism for directing the group's affairs on a continuing, rather than an ad hoc, basis.'"  *Id.* at 682 (quoting *U.S. v. Kragness*, 830 F.2d 842, 856 (8th Cir. 1987)).  The court went on to explain that there was "no allegation that CommonPoint directed or influenced decisions made by its end lenders and investors or vice versa, nor do Plaintiffs allege that any specific act was performed by the alleged group in furtherance of an agreed-upon goal."  *Id.*

The same flaws exist in the instant case.  Plaintiff states that Kelly Gleason is the person "who operated the enterprise consisting of the conspiracy between the brokers and the lenders to carry out the fraudulent scheme of defendants."  (Amended Complaint, at p. 4).

However, there is no allegation that Ms. Gleason operated an "on-going organization" of the type targeted by the RICO statute.  Plaintiff's complaints are limited to a one-time mortgage deal with an alleged above-market interest rate and a YSP.  There is no allegation that this group of defendants operates as a continuous unit or "enterprise."

Moreover, Plaintiff has failed to sufficiently plead the pattern of racketeering activity elements.   "Mere allegations cannot raise a single transaction to the level of RICO."  *Lambert Plumbing, Inc. v. Western Sec. Bank*,  934 F.2d 976, 982 (8th Cir. 1991).  "[A] single transaction which involves only one victim and takes place over a short period of time does not constitute the pattern of racketeering required for long-term criminal activity under a RICO claim.  *Id.* at 981.  For these reasons, Plaintiff's RICO allegations are dismissed as to all of the Defendants.

<u>Remaining Claims</u>

When a district court dismisses federal claims over which it has original jurisdiction, the balance of interests usually "will point toward declining to exercise jurisdiction over the remaining state law claims." *In re Canadian Import Antitrust Litigation,* 470 F.3d 785, 792 (8th Cir. 2006)(quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *see also Gibson v. Weber*, 433 F.3d 642, 647 (8th Cir. 2006); 28 U.S.C. § 1367(c)(3)).  Because the Court has dismissed Plaintiff's only federal claim, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.  Therefore, Plaintiff's claim under the Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-107, et.seq.,  intentional interference with contractual relations, and class action claims are dismissed.

In conclusion, Defendants' Motions to Dismiss (Docket # 23, # 25, and # 30) are GRANTED.  Finance America's Supplemental Motion to Strike (Docket # 35) is MOOT.  The

Clerk is directed to close the case.

IT IS SO ORDERED this 5th day of August 2008.

_____
James M. Moody
United States District Judge